CHARLES D. McNELTON, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 32448

December 13, 1999                              990 P.2d 1263

---

[4]In light of this opinion, we vacate our order granting a stay entered on March 23, 1998.

[Rehearing denied March 1, 2000]

*JoNell Thomas,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, and *Christopher J. Laurent,* Chief Deputy District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

On May 13, 1989, appellant Charles McNelton approached Monica Glass in Las Vegas and shot her in the head, killing her. McNelton v. State, 111 Nev. 900, 902, 900 P.2d 934, 935 (1995), *cert. denied,* 517 U.S. 1212 (1996). McNelton was subsequently

charged with Glass's murder and the state sought the death penalty. McNelton presented an alibi defense, arguing that he was in Los Angeles at the time of the shooting. The jury returned a guilty verdict of one count of first-degree murder with the use of a deadly weapon and imposed the death penalty. On direct appeal, McNelton raised arguments pertaining to the guilt and penalty phases of his trial. This court rejected all of McNelton's contentions. *Id.* at 902-08, 900 P.2d at 935-39. McNelton subsequently filed a post-conviction petition for a writ of habeas corpus in the district court claiming ineffective assistance of trial and appellate counsel. After a hearing, the district court denied the petition. This appeal followed. We affirm.

## *FACTS*

McNelton lived with Brian Jackson, his cousin, at 1237 Hart Street in Las Vegas, near Gerson Park. Andre Lee and his family lived several houses down the street. Lee, Jackson, and Glass, the sixteen-year-old victim, all sold crack cocaine on Hart Street. At some point in 1989, a dispute arose among those three because Lee's brother-in-law Leroy Wilson was helping Jackson sell cocaine at night. Wilson normally sold for Glass. Jackson apparently wanted Wilson to sell for him full-time, but Wilson was loyal to Glass and had refused.

In the afternoon on May 13, 1989, Lee was selling crack cocaine on the street in front of his house. Lee's wife Linda and two other women were also outside the house. Jackson rode up to Lee on a bicycle and told Lee to stop selling. Lee testified that Jackson "didn't want anybody to sell anything if they wasn't selling it for him." Lee ignored Jackson, who cycled home. Approximately five minutes later, Jackson returned with a gun. When a customer drove up, Jackson put the gun, a .25 caliber automatic, to Lee's temple and told him not to go to the customer. Lee did anyway. Jackson appeared upset by this and cycled back toward his house.

Approximately five to ten minutes later, McNelton approached Lee from the direction Jackson had gone. McNelton asked Lee if Lee was messing with his cousin, meaning Jackson. Glass then came out of Lee's house and walked to the end of the sidewalk, where everyone was assembled. McNelton asked her the same question. Glass said, "Chuck, get outta my face with that shit." McNelton responded, "I'm gonna show you what I do to people who mess with my family." McNelton then grabbed the back of Glass's head with his left hand, placed a gun to her forehead with his right, and fired once, killing her.

On June 16, 1989, an indictment was filed charging McNelton with one count each of murder and manslaughter with the use of a deadly weapon. The manslaughter count, which was based on the fact that Glass was pregnant at the time of the shooting, was subsequently dismissed. McNelton was located in California, where he was serving an unrelated prison sentence, and was not extradited to Nevada until December 1991. On June 1, 1992, McNelton filed a motion to dismiss the indictment on the ground that the State of Nevada failed to bring him to trial within 180 days as required by the Interstate Agreement on Detainers. The district court first granted McNelton's motion, then on rehearing denied it and set the matter for trial.

On March 4, 1992, the state filed a notice of intent to seek the death penalty. The state alleged five aggravating circumstances: (1) McNelton was convicted of robbery in California in 1980; (2) McNelton was convicted of assault with the use of a deadly weapon with great bodily injury in California in 1984; (3) McNelton was convicted of attempted robbery in California in 1984; and (4) McNelton was under sentence of imprisonment for the 1984 attempted robbery at the time he committed the instant crime; and (5) McNelton was under sentence of imprisonment for the 1984 assault at the time he committed the instant crime. Also on March 4, 1992, McNelton filed a notice of alibi, claiming that his wife Wanda would testify that he was in Los Angeles at the time of the shooting. On September 17, 1993, McNelton filed another notice of alibi listing the following additional witnesses: Elmore Hearon, Randolph Lee, Michael Turner, and Judy Lacy. All of those witnesses, with the exception of Lacy, testified in support of McNelton's alibi.

Trial took place October 5-7, 1993. The jury returned a verdict of guilty of one count of first-degree murder with the use of a deadly weapon. The penalty phase was held October 11-13, 1993. The jury found two aggravators: (1) the murder was committed by a person who was previously convicted of a felony involving the use or threat of violence; and (2) the murder was committed by a person under sentence of imprisonment. The jury concluded that any mitigating circumstances did not outweigh the aggravating circumstances and returned a verdict of death. On October 21, 1993, the district court entered a judgment of conviction pursuant to the verdicts.

On direct appeal, McNelton raised two arguments pertaining to the guilt phase of the trial: (1) the prosecutor failed to provide gender-neutral grounds for the exercise of peremptory challenges when six men and three women were challenged; and (2) the dis-

trict court failed to prevent him from presenting an alibi defense (which he claimed on appeal was an unwise tactical decision which destroyed his credibility). Without discussing these claims, this court concluded that they lacked merit. *McNelton,* 111 Nev. at 902, 900 P.2d at 935.

With respect to the penalty phase, McNelton argued on direct appeal that: (1) the prosecutor committed misconduct in rebuttal closing argument by commenting on his failure to express remorse in his allocution statement; (2) the district court erred in failing to advise him that if he testified in the penalty phase the prosecutor's cross-examination would be limited to the scope of the mitigation testimony; (3) the district court erred in admitting evidence that Glass was pregnant; and (4) the jury improperly found the aggravator that the murder was committed by a person who was previously convicted of a felony (because his prior felony convictions were legally infirm), and that he was under sentence of imprisonment (because he was on parole). This court discussed each of these contentions and rejected all of them. *Id.* at 903-908, 900 P.2d at 936-39.

On August 6, 1996, McNelton filed a proper person postconviction petition for a writ of habeas corpus claiming ineffective assistance of trial and appellate counsel. Counsel was subsequently appointed for McNelton. On September 22, 1997, appointed counsel filed an amended petition claiming: (1) appellate counsel was ineffective for failing to argue that (a) the district court erred in admitting a prior bad act, namely allowing a Las Vegas Metropolitan Police Department (LVMPD) officer to testify to extraneous events which occurred on February 24, 1989, and with regard to items discovered during a search of McNelton's house; (b) the prosecutor improperly mentioned in closing argument McNelton's silence; (c) the prosecutor shifted the burden of proof; (d) the jury should not have been instructed on the statute of limitations for sale of a controlled substance; (2) trial counsel was ineffective for failing to call McNelton's mother in the penalty phase; and (3) the prosecutor committed misconduct in commenting in closing argument on McNelton's lack of remorse.

In a second amended petition filed October 13, 1997, counsel raised the same issues plus a new one: (1)(e) appellate counsel was ineffective for failing to argue that the district court abused its discretion in denying McNelton's motion to dismiss. The state opposed the petition.

On April 3 and 17, 1998, the district court held an evidentiary hearing and heard argument on McNelton's petition. On May 18, 1998, the district court entered an order denying the petition. McNelton timely appealed.

## DISCUSSION

I. *Trial and appellate counsel provided McNelton with effective assistance of counsel*

Generally, this court will defer to the district court's factual findings concerning claims of ineffective assistance of counsel. Hill v. State, 114 Nev. 169, 175, 953 P.2d 1077, 1082, *cert. denied,* 525 U.S. 1042 (1998). However, because these types of claims present a mixed question of law and fact, they are still subject to this court's independent review. Kirksey v. State, 112 Nev. 980, 987, 923 P.2d 1102, 1107 (1996) (citing State v. Love, 109 Nev. 1136, 1138, 865 P.2d 322, 323 (1993)).

This court reviews claims of ineffective assistance of counsel under the "reasonably effective assistance" standard set out in Strickland v. Washington, 466 U.S. 668 (1984). Warden v. Lyons, 100 Nev. 430, 683 P.2d 504 (1984). Under *Strickland,* a defendant challenging the adequacy of his counsel's representation must show: (1) counsel's performance was deficient, i.e., counsel's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defendant, i.e., "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 687-89, 694; *see* Dawson v. State, 108 Nev. 112, 115, 825 P.2d 593, 595 (1992). A court may consider the two prongs in any order and need not consider both if the defendant makes an insufficient showing on either one. *Strickland,* 466 U.S. at 697.

### A. *Claims concerning trial counsel*

#### 1. *Failure to request a Petrocelli hearing*

McNelton argues that trial counsel were ineffective for failing to request a hearing pursuant to Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985), and failing to seek to exclude evidence concerning his arrest for possession of firearms.

In his opening statement, the prosecutor said that during a search of McNelton's house, McNelton told LVMPD Officer Raymond Berni that he had a gun in the house and Berni impounded the gun. The prosecutor also said that Berni took a picture of McNelton. The defense did not object to these statements.

Berni subsequently testified that on February 24, 1989, he was dispatched to 1237 Hart Street, the house McNelton was living

in, because shots were fired from the residence. McNelton and another man gave Berni permission to search the house, and Berni found a shotgun and a pistol on the master bedroom floor. Berni identified a photograph of McNelton taken the day of the search as a Clark County Detention Center (CCDC) photograph; this testimony was stricken. However, the photograph, which had a piece of tape covering part of it indicating that it was taken at the CCDC, was apparently admitted into evidence. The trial judge then asked Berni what date the photograph was taken. Berni replied, ''The date of the arrest.'' This testimony was not stricken.

After the next witness testified and outside the presence of the jury, defense counsel moved for a mistrial on the ground that it was highly prejudicial for the jury to learn that McNelton was possibly arrested in February. The prosecutor stated that he had not wanted any information to come out about an arrest or the CCDC. In the argument on the motion, it came out that the judge had erroneously believed that one of the weapons that Berni found during the search was similar to the murder weapon. Despite this misunderstanding, the judge denied the motion. The judge agreed to admonish the jury with respect to Berni's testimony if the defense so requested, but the defense chose not to. The defense subsequently renewed the motion for a mistrial. The judge again denied the motion, concluding that McNelton had not suffered any prejudice.

At the evidentiary hearing on the petition, the district court determined that a *Petrocelli* hearing should have been held. The court concluded that the trial judge should not have allowed evidence of the police response to the ''shots fired'' complaint because the guns involved had nothing to do with the gun used in the killing and that the trial judge misunderstood this. The court also concluded that although the photograph was relevant because it was included in a photographic lineup used to identify McNelton, testimony that the photograph was taken at the CCDC was properly stricken. The court further concluded that testimony that the photograph was taken the date McNelton was arrested should have been excluded, but that any prejudice resulting from this was slight considering the overwhelming evidence against him. Overall, the court concluded that the outcome of the trial would not have been affected even if the improper evidence had been excluded.

McNelton argues that had trial counsel insisted on a *Petrocelli* hearing prior to the introduction of Berni's testimony, the judge would have known that neither of the guns found at the house was the murder weapon and the jury would not have learned that McNelton was arrested for possessing guns. McNelton argues that

admission of the evidence was not harmless because it damaged his credibility and led the jury to disbelieve his alibi defense.

■■■■■■■■

We conclude that a *Petrocelli* hearing should have been held and evidence of the police response excluded. Prior to admitting evidence of a prior bad act pursuant to NRS 48.045(2), the district court is required to conduct a hearing on the record outside the presence of the jury and determine that: (1) the incident is relevant to the crime charged; (2) the act is proven by clear and convincing evidence; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.[1] Tinch v. State, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997); *Petrocelli,* 101 Nev. at 51-52, 692 P.2d at 507-08; *see* NRS 48.035(1). The CCDC photograph is relevant because it was used as part of a photographic lineup for witnesses. However, evidence that McNelton was arrested the day Berni searched the house and that guns were found in the house is not relevant and therefore not admissible pursuant to NRS 48.045(2).

■■■■■■■■

The district court's failure to hold a *Petrocelli* hearing does not necessarily require reversal of the conviction. Reversal is not necessary if: (1) the record is sufficient to determine that the evidence is admissible under *Tinch;* or (2) the result would have been the same if the trial court had not admitted the evidence. Qualls v. State, 114 Nev. 900, 903-04, 961 P.2d 765, 767 (1998). As discussed above, the evidence is not admissible under *Tinch.* Thus, we view Berni's testimony about the police response in light of all the evidence presented at trial to determine if the result would have been the same if the trial court had not admitted the evidence. Substantial evidence was presented against McNelton, namely the testimony of three witnesses, Andre and Linda Lee and Leroy Wilson, who witnessed McNelton shoot Glass.

The evidence in support of McNelton's alibi defense was not as convincing. Randolph Lee, for whom McNelton worked from April through June 1989 in California as a laborer, testified that McNelton never missed work and never took time off to go to Las Vegas. However, Lee did not know if McNelton worked on May 13, 1989 (the day of the shooting), and did not keep any records. Further, Lee's testimony that McNelton never missed work to go

---

[1]NRS 48.045(2) provides in full:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

to Las Vegas was undermined by the subsequent defense stipulation that McNelton was in Las Vegas on Monday, April 10, 1989, through Wednesday, April 12, 1989. Another of McNelton's former employers, Elmore Hearon, testified that McNelton worked for him in California for one year cleaning carpets beginning in February 1989. Hearon had time cards that he had initialed which showed that McNelton worked for him on May 13, 1989, from 5:00 to 9:30 p.m. However, the prosecutor called the validity of the time cards into question, arguing in rebuttal closing argument that the time cards were all initialed in the same ink even though Hearon claimed to have initialed them each day when the employees left work.

McNelton's wife Wanda testified that on the day of the shooting, McNelton dropped her off at her friend Judy Lacy's house in Los Angeles. She and Lacy later went to a party where she met up with McNelton. At the end of the evening, McNelton dropped her off at Lacy's house, and he spent the night at a friend's house. The following morning, McNelton and Wanda returned to their house in Lancaster, California. Wanda's testimony was called into question during the state's rebuttal case. Richard Crotsley, a homicide detective for the Los Angeles Police Department (LAPD), testified that when he interviewed Wanda in September of 1993, she said that she did not remember what happened on May 13, 1989, because of an old head injury. She also said that her memory was not good. Wanda never mentioned the party to Crotsley. Lacy did not testify.

We conclude that the result of the trial would have been the same if the court had not admitted Berni's testimony about the police response to the ''shots fired'' call. Accordingly, the district court's failure to hold a *Petrocelli* hearing where one was warranted does not mandate reversal of McNelton's conviction. Thus, McNelton was not prejudiced by his counsel's failure to request a *Petrocelli* hearing, and therefore counsel were not ineffective.

> 2. *Failure to object to the prosecutor's comments on and defense counsel's testimony about McNelton's in-custody status*

McNelton argues that his trial counsel were ineffective for failing to prevent the prosecutor from eliciting testimony from Michael Turner, McNelton's cousin, that McNelton was in custody prior to trial. Turner testified as an alibi witness. McNelton also argues that his trial counsel were ineffective because one of them testified with respect to this issue.

During cross-examination, Turner mentioned that McNelton was in custody. The prosecutor asked Turner, ''Did you ever talk

to [Wanda McNelton] about [McNelton] being arrested for murder?'' Turner replied, ''I found out through my family that my cousin was like incarcerated.'' Later in cross-examination, the prosecutor asked Turner about finding out that McNelton was incarcerated. On recross-examination, the prosecutor asked Turner about visiting McNelton in 1992 in Las Vegas, ''You mean to tell me that [McNelton] didn't ask you to testify in this matter way back in 1992?'' Turner replied, ''No, we didn't even talk about why he was in jail.'' The prosecutor then asked whether Turner knew why McNelton was in jail and whether anyone told Turner not to tell the jury that he had visited McNelton in jail.

Mentioning that McNelton was incarcerated and eliciting that information from Turner was improper. We have previously stated that ''[i]nforming the jury that a defendant is in jail raises an inference of guilt, and could have the same prejudicial effect as bringing a shackled defendant into the courtroom.'' Haywood v. State, 107 Nev. 285, 288, 809 P.2d 1272, 1273 (1991). In *Haywood,* the prosecutor referred to the fact that the defendant had been in custody between the time of his arrest and trial; the prosecutor cross-examined the defendant about jail visits he received from friends and relatives. *Id.* at 287, 809 P.2d at 1273. We concluded in *Haywood,* however, that this error was harmless because five witnesses identified the defendant and other evidence connected him to the crime. *Id.* at 288, 809 P.2d at 1273. Likewise, we conclude that the error in the instant case was harmless because of the substantial evidence of McNelton's guilt. Counsel therefore were not ineffective on this ground.

As noted above, McNelton also argues that one of his defense counsel, Drew Christensen, made matters worse by taking the stand shortly after Turner testified. Turner had testified on direct examination that the last time he saw McNelton was at the party in 1989. On cross-examination, however, Turner said that the last time he saw McNelton was when he visited him in the Las Vegas jail in 1992 and that Christensen told him not to say anything about that visit. When Christensen testified, he denied telling Turner not to mention visiting McNelton and said that he told Turner not to mention that McNelton was in jail because he did not want the jury to know that McNelton was incarcerated.

Christensen could have bolstered Turner's credibility when he explained to the jury that Turner was not trying to hide anything, but simply thought that he had been instructed not to mention the jail visit. On the other hand, Christensen could have hurt McNelton if it appeared to the jury that Christensen was just try-

ing to vindicate himself. We do not decide whether counsel's decision to have Christensen testify was right or wrong, but conclude that the decision was a tactical one and unchallengeable absent extraordinary circumstances not present here. *See Strickland*, 466 U.S. at 690-91; Howard v. State, 106 Nev. 713, 722, 800 P.2d 175, 180 (1990). Accordingly, we conclude that counsel were not ineffective on this ground.

### 3. *Failure to object to the prosecutor's comment in closing argument that McNelton failed to call a witness*

McNelton argues that trial counsel were ineffective in failing to anticipate, prevent, and/or object to the prosecutor's statement in closing argument that McNelton failed to call Judy Lacy as an alibi witness. McNelton argues that this comment wrongly shifted the burden of proof to him.

During rebuttal closing argument, the prosecutor said:

> And then she [Wanda McNelton] comes into court during the course of this trial, and she tells you that she's certain that it was May 13th, 1989 that she went to this alleged party over at Felicia's house. And the Defendant was with her this entire time. And she's certain of it because of this illness that she had; she is positive. *By the way, we never heard from Judy Lacy.* I'm not saying that the Defense needs to bring her forward. *But wouldn't it have been nice to hear from this person, the friend of the McNelton family?*
>
> Regardless of that, and certainly don't hold that against them, it is my burden of proof to prove beyond a reasonable doubt. But when you're looking at credibility, certainly that's an issue for you to consider.

(Emphasis added.)

We disagree with the district court's conclusion that this comment went to Wanda McNelton's credibility and did not shift the burden to the defense. In Ross v. State, 106 Nev. 924, 926, 803 P.2d 1104, 1105 (1990), the prosecutor directed the jury's attention to the fact that a person whose testimony would have supported the defense theory did not testify and called on defense counsel to "explain why [this person] didn't come forward." This court stated that such a comment could be viewed as impermissibly shifting the burden of proof to the defense. Such shifting is improper because it suggests to the jury that the defendant has the burden to produce proof by explaining the absence of witnesses or evidence. *Id.* at 927, 803 P.2d at 1105-06. This court concluded that the impact of the prosecutor's above comment, along with

other of the prosecutor's statements including that the main defense witness was a liar, had the practical effect of shifting the burden of proof to the defendant. *Id.* at 927-28, 803 P.2d at 1106. The judgment was reversed on the ground that the errors were not harmless and deprived the defendant of a fair trial. *Id.* at 928-29, 803 P.2d at 1106-07.

As in *Ross,* we conclude here that the prosecutor shifted the burden to the defense by commenting on Lacy's absence. If the prosecutor only intended to impugn Wanda McNelton's credibility, he could have asked the jury to consider why she failed to mention the party to LAPD Detective Crotsley when he interviewed her, or otherwise highlighted her admission that her memory was not good. However, we conclude that the prosecutor's comment did not deprive McNelton of a fair trial. Absent this comment, we conclude that the jury would have reached the same verdict. *See id.* As mentioned above, substantial evidence was presented against McNelton. *See* Rippo v. State, 113 Nev. 1239, 1253-54, 946 P.2d 1017, 1026 (1997) (because evidence of guilt was overwhelming, holding harmless error where prosecutor's closing argument comment that there was no testimony that the defendant was elsewhere when the murder was committed and other comments may have shifted the burden of proof to the defense), *cert. denied,* 525 U.S. 841, 119 S. Ct. 104 (1998). Accordingly, we conclude that counsel were not ineffective on this ground.

> 4. *Failure to object to the jury instruction concerning the statute of limitations for sale of a controlled substance*

McNelton argues that his trial counsel were ineffective for failing to object to guilt phase jury instruction 18(a):

> In the State of Nevada the statute of limitations for the sale of a controlled substance is three years. This means that the office of the District Attorney may not commence a criminal proceeding against a suspect for sale of a controlled substance more than three years after the crime was committed. There is no statute of limitations for murder.

McNelton argues that this instruction misled the jury "about the fact that prosecution witnesses were receiving favorable treatment for their testimony," possibly because the instruction implied that the state's alleged failure to commence a criminal proceeding against prosecution witnesses indicated those witnesses were inno-

cent. McNelton also argues that the jury was not alerted to those witnesses' bias in favor of the state.

We conclude that this instruction did not mislead the jury in the manner McNelton suggests. First, McNelton does not produce any support for this argument, other than to generally allege that the state did not prosecute certain witnesses for selling drugs in exchange for their testimony. Although McNelton does not specify which witnesses received favorable treatment, he is presumably referring to Andre and Linda Lee and Leroy Wilson. Second, the jury would not infer from the instruction that the state refrained from prosecuting those witnesses because they were not involved in selling drugs. Andre Lee and Leroy Wilson admitted on direct examination that they sold cocaine at the time of the shooting. The jury may have discounted their testimony based on those admissions, regardless of whether those witnesses were ever convicted for selling drugs on that occasion.

The jury may also have discounted those witnesses' testimony based on information elicited on cross-examination. For example, Andre Lee testified on cross-examination that in March 1993, he was convicted of attempted accessory to commit burglary and received a suspended sentence of two years in prison. Andre Lee also admitted that the main source of his income in 1989 was narcotic sales and that he used narcotics. On cross-examination of Linda Lee, she admitted that she sold cocaine. Finally, Wilson testified on cross-examination that he used cocaine and that drug sales were his only source of income. Accordingly, we conclude that counsel were not ineffective on this ground.

### 5. *Failure to have McNelton's mother testify during the penalty phase*

McNelton contends that trial counsel were ineffective because they failed to call his mother as a penalty phase witness. He argues that while counsel are bound, for example, by a client's decision regarding whether the client will testify, counsel were not bound by McNelton's decision that his mother not testify. *Cf.* SCR 152(1) (a lawyer shall abide by a client's decision concerning the objectives of representation).

At the evidentiary hearing on the petition, defense counsel Christensen testified that although McNelton's mother was present in the courtroom, she was not called as a witness in mitigation because McNelton forbade the defense from calling her. The decision as to what mitigating evidence to present was a tactical one. *See Howard,* 106 Nev. at 722, 800 P.2d at 180. Because

defense counsel attempted to have McNelton's mother testify but McNelton refused to allow them to do so, we conclude that defense counsel were not ineffective. *Cf.* Singleton v. Lockhart, 962 F.2d 1315 (8th Cir. 1992) (holding that defense counsel was under no duty to put on mitigating evidence where the defendant made a knowing and intelligent decision not to present any mitigating evidence).

### B. *Claims concerning appellate counsel*

#### 1. *Failure to communicate with McNelton*

McNelton argued in the district court, in support of another argument, that he never once spoke with his appellate attorney. The district court did not specifically address this issue because it was not raised as a separate issue in the petition. McNelton raises it here, however, arguing that his appellate counsel was ineffective because counsel failed to consult with McNelton as he crafted arguments on direct appeal. McNelton argues that counsel's performance was deficient *per se*.

The record does not belie McNelton's contention that his appellate counsel did not meet or speak with him. In July and again in August 1994, appellate counsel filed in this court a motion to withdraw based on a letter from McNelton stating that appellate counsel did not answer McNelton's letters, visit him, or take his telephone calls. This court denied the motion, concluding that McNelton's letter did not constitute good cause for appellate counsel to seek appointment of a substitute. Appellate counsel did not thereafter seek to withdraw. We conclude that appellate counsel should have met or spoken with McNelton to discuss his direct appeal. This court has held that failure to communicate with a client warrants disciplinary action. *See* State Bar of Nevada v. Schreiber, 98 Nev. 464, 464, 653 P.2d 151, 151 (1982) (published letter of reprimand stating that ''communication with a client is, in many respects, at the center of all services''). Although the circumstances in *Schreiber* are different from those presented here, the ideas expressed there regarding communication are always applicable.

However, even assuming that counsel's performance was deficient because he failed to meet with McNelton, we conclude that McNelton was not prejudiced thereby. There is not a reasonable probability that the result of the direct appeal would have been different had McNelton consulted with his counsel with respect to how to proceed. *See Strickland,* 466 U.S. at 687. McNelton has

not specified here any issues that he would have instructed appellate counsel to raise that counsel neglected to raise. *Cf.* Stewart v. Warden, 92 Nev. 588, 555 P.2d 218 (1976) (holding that where attorney failed to raise requested claims on appeal for no apparent reason, good cause exists to raise those claims on postconviction). Accordingly, we conclude that counsel was not ineffective on this ground.

## 2. *Failure to challenge the extradition proceedings*

McNelton contends that appellate counsel was ineffective for failing to argue that the trial court erred in denying his motion to dismiss. He argues that counsel should have argued that the state relied on hearsay documents and that the case the district court relied on in denying his motion is not controlling in Nevada and is wrong as a matter of federal law. McNelton also argues that *trial* counsel were ineffective for failing to fully investigate and demand an evidentiary hearing on the extradition issue.

In his motion to dismiss, McNelton argued that Nevada's failure to follow Article III(a) of the Interstate Agreement on Detainers (IAD) (codified at NRS 178.620) warranted dismissal. Article III(a) essentially provides that a state must bring a defendant under a term of imprisonment in another party state to trial within 180 days if:

> "(1) the defendant has entered upon a term of imprisonment in a penal or correctional institution of a party state, (2) during the continuance of that term of imprisonment the charges in question are pending against the defendant in another party state, (3) a detainer based on such charges has been lodged against the defendant, and (4) the defendant has caused written notice and request for final disposition of the charges to be delivered to the appropriate prosecuting authorities and court."

State v. Wade, 105 Nev. 206, 208, 772 P.2d 1291, 1293 (1989) (quoting United States v. Hutchins, 489 F. Supp. 710, 713 (N.D. Ind. 1980)); *see* NRS 178.620, Article III(a). Failure to bring the defendant to trial within 180 days results in dismissal of the charges with prejudice. *Wade,* 105 Nev. at 208, 772 P.2d at 1293 (citing NRS 178.620, Article V(c)).

After hearing argument on the motion, the district court concluded that McNelton made an Article III request to California

authorities no later than June 19, 1991,[2] which triggered California's obligation to notify Nevada to retrieve McNelton and try him. The court concluded that McNelton was not even brought to Nevada until after the 180 days had run. The court entered its written order granting McNelton's motion on August 18, 1992.

The state moved for rehearing on the ground that at the time it granted McNelton's motion, the court was operating under the mistaken belief that McNelton had signed the request for disposition of the charges on June 19, 1991, when that form was actually not dated. The state also argued that because McNelton had been released on parole prior to being sent to Nevada, the IAD did not apply. As support, the state attached an affidavit of Nadine Mulkey, the extradition coordinator for the Clark County District Attorney's office. The affidavit stated that Mulkey did not receive from either McNelton or California prison authorities a request for disposition of the charges against him. It further stated that Mulkey examined the request for disposition and other documents attached to McNelton's motion to dismiss and was not aware that those documents existed.

At a September 15, 1992 hearing on the state's motion, the district court was concerned because Mulkey's affidavit contained different facts than the court was aware of previously. The court said that Mulkey's affidavit was hearsay and the court could not consider it as evidence of facts. The court took the matter under submission. The next day, however, the court vacated its order dismissing the case and granted the state's motion solely to reconsider whether McNelton had been under a term of imprisonment pursuant to Article III(a).

On September 17, 1992, believing that the district court's order granting its motion for rehearing was a "legal nullity," the state appealed from the district court's order dismissing the case. This court dismissed the appeal, concluding that it lacked jurisdiction because the district court vacated the order appealed from. In a footnote, this court stated that the district court was "free to consider the applicability of any recent opinions of the United States Supreme Court," specifically citing Fex v. Michigan, 507 U.S. 43 (1993). State v. McNelton, Docket No. 23898 (Order Dismissing Appeal, April 27, 1993).

At a hearing on May 6, 1993, the district court stated that

---

[2]Actually, the court concluded that McNelton made the request no later than *July* 19, 1991. Because no evidence was presented that McNelton made the request in July, however, it appears that the court meant *June* 19, 1991.

although its original order on this issue was consistent with the dissent in *Fex,* it believed that the majority in *Fex* obligated the court to deny McNelton's motion to dismiss. *Fex* holds that Article III(a)'s 180-day time period does not begin to run until a prisoner's request for final disposition of the charges against him is actually delivered to the court and the prosecuting officer of the jurisdiction that lodged the detainer against him. *Fex,* 507 U.S. at 52. Defense counsel agreed that *Fex* was dispositive. The court granted the state's motion for reconsideration, denied McNelton's motion to dismiss, and set the matter for trial.

We conclude that appellate counsel was not ineffective for failing to raise this issue on appeal because the district court did not abuse its discretion in denying McNelton's motion to dismiss. *See* Steese v. State, 114 Nev. 479, 490, 960 P.2d 321, 328 (1998). First, the court was not bound by its statement at the September 15, 1992 hearing that Mulkey's affidavit was hearsay. The court could consider Mulkey's statement in her affidavit that the prosecutor's office did not receive from McNelton a request for final disposition of the charges against him. Second, *Fex* is directly on point, and the district court did not err in applying it. *See Fex,* 507 U.S. at 52. Thus, had appellate counsel argued on appeal that the district court erred in considering the affidavit because it was hearsay and *Fex* did not apply, there is not a reasonable probability that this court would have reversed the judgment. We further conclude that trial counsel were not ineffective for failing to demand an evidentiary hearing on this issue. McNelton does not specify what evidence trial counsel would have presented such that there is a reasonable probability that the district court would have granted the motion.

> 3. *Failure to adequately present the issue that McNelton's Fifth Amendment rights were violated when the prosecutor commented on McNelton's lack of remorse*

McNelton argues that even though appellate counsel raised this issue on direct appeal, counsel was ineffective for failing to present on direct appeal the "plethora of authority" establishing that the prosecutor's comment on McNelton's lack of remorse violated the Fifth Amendment privilege against self-incrimination. Should this court conclude that this issue was adequately presented, McNelton argues that he is still entitled to relief because this court's opinion on direct appeal is wrong.

On direct appeal, this court considered the prosecutor's remarks and concluded that they did not violate the Fifth Amendment. *See McNelton,* 111 Nev. at 903-05, 900 P.2d at 936-37. Our previous holding on this issue is now the law of the case, and this doctrine cannot be avoided by a more detailed and precisely focused argument. Pertgen v. State, 110 Nev. 554, 557-58, 875 P.2d 361, 363 (1994). Accordingly, we decline to reconsider this issue. *See* Marshall v. State, 110 Nev. 1328, 1331, 885 P.2d 603, 605 (1994); *Dawson,* 108 Nev. at 120, 825 P.2d at 598.

## II. *Issues McNelton did not raise in his post-conviction petition in the district court*

McNelton raises numerous issues that he failed to raise in his petition below. These issues concern the effectiveness of trial,[3]

---

[3]McNelton argues that his **trial counsel were ineffective (1) for reasons this court mentioned on direct appeal:** (a) failure to properly prepare McNelton before he made his allocution statement; and (b) failure to present evidence challenging the validity of McNelton's prior convictions; **and (2) for reasons apparent on the record:** (a) failure to investigate and call witnesses concerning whether the state followed the terms of the IAD; (b) failure to object that the prosecutor's peremptory challenges were gender based and to the defense's mistaken use of gender-based peremptory challenges; (c) failure to challenge the venire pool on the ground that African-Americans were underrepresented; (d) failure to have McNelton participate in exercise of peremptory challenges; (e) failure to investigate the possibility that someone else committed the murder or to fully investigate McNelton's alibi defense; (f) failure to competently present McNelton's alibi defense, including failure to interview alibi witnesses and review exhibits allegedly supporting alibi prior to their introduction; (g) failure to correctly inform the jury as to the date McNelton provided his alibi to the prosecutors; (h) failure to object or move to preclude the prosecutor from commenting on McNelton's wife's invocation of the spousal privilege; (i) failure to object or move to preclude the prosecutor from asking questions which suggested that McNelton intimidated a witness; (j) failure to object or move to preclude introduction of prior consistent statements; (k) failure to have bench hearings recorded pursuant to SCR 250; (l) failure to object to prosecutorial misconduct; (m) failure to challenge the constitutionality of Nevada's death penalty scheme; (n) failure to file a motion to dismiss the "under sentence of imprisonment" aggravator; (o) failure to object to admission of evidence outside of the aggravators; (p) failure to request that the jury be required to specify which mitigating circumstances were considered and rejected; (q) failure to seek dismissal of the notice of intent to seek the death penalty based on the fact that the death penalty constitutes "cruel and unusual" punishment prohibited by the Eighth Amendment; (r) failure to seek dismissal of the death penalty on the ground that it is unconstitutional under the "cruel or unusual" provision of the Nevada Constitution; (s) failure to investigate for mitigating evidence to present at the penalty phase; (t) failure to object to the jury instruction that the Pardons Board has the power to modify a sentence.

appellate,[4] and post-conviction counsel.[5] He argues that this court may determine as a matter of law, without the need for an evidentiary hearing, that trial, appellate, and post-conviction counsel were ineffective, citing Jones v. State, 110 Nev. 730, 877 P.2d 1052 (1994), and Mazzan v. State, 100 Nev. 74, 675 P.2d 409 (1984). In the alternative, McNelton requests that this court remand to the district court for a hearing on all of his post-conviction claims.

McNelton generally argues that each of the errors included here but not raised below deprived him of various rights, including the right to effective assistance of counsel. McNelton does not, however, allege good cause and prejudice for failing to include these issues in his petition. *See Hill,* 114 Nev. at 178, 953 P.2d at 1084 (this court generally declines to consider issues not raised in a post-conviction petition filed in district court when no cause and prejudice is alleged for the failure to raise issues below). Accordingly, we do not address these claims.

## CONCLUSION

We conclude that none of the contentions properly before this

---

[4]McNelton argues that his **appellate counsel was ineffective (1) for reasons this court mentioned on direct appeal**: (a) failure to adequately present the issue concerning McNelton's rights under the Fifth Amendment and alleged lack of remorse (as this issue was presented in McNelton's petition and is raised here on appeal, it is addressed earlier in this Opinion); (b) failure to adequately support claim that the "under sentence of imprisonment" aggravator is unconstitutional because it is racially biased; (c) failure to adequately set forth claim regarding evidence that Glass was pregnant and victim impact evidence; **and (2) for reasons apparent on the record**: (a) failure to challenge the constitutionality of Nevada's death penalty scheme; (b) failure to argue that the district court erred in admitting testimony concerning the autopsy of Glass; (c) failure to argue that the reasonable doubt instruction was invalid.

[5]McNelton argues that his **post-conviction counsel was ineffective for reasons apparent on the record**: (a) failure to investigate the backgrounds of the state's and McNelton's alibi witnesses in order to challenge the sufficiency of trial counsel's investigation, and failure to investigate McNelton's background to determine whether there was mitigating evidence that should have been presented at trial; (b) failure to investigate whether there was any conflict of interest presented by the public defender's representation of McNelton, any potential conflict because Judge Thompson is now a supervisor at the Clark County D.A.'s office, or any conflict because McNelton's attorney Drew Christensen formed a partnership with the prosecutor, Rex Bell, shortly after trial; (c) failure to raise the above issues; (d) failure to challenge this court's failure to meaningfully review this case on appeal pursuant to NRS 177.055.

Apparently, post-conviction counsel was appointed in late 1996 or early 1997 pursuant to NRS 34.820(1)(a), so McNelton was entitled to effective assistance of that counsel. *See* Crump v. Warden, 113 Nev. 293, 303, 934 P.2d 247, 253 (1997); McKague v. Warden, 112 Nev. 159, 165 n.5, 912 P.2d 255, 258 n.5 (1996).

court has merit. We deny relief with respect to those claims raised for the first time on appeal because McNelton has failed to show cause and prejudice. The district court's order denying McNelton's post-conviction petition is affirmed.